UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE PICTURE PEOPLE, INC.,

Plaintiff,

-against-                                                    08 Civ. 4499 (LAK)

IMAGING FINANCIAL SERVICES, INC., et ano.

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED #: 8/16/10

# MEMORANDUM OPINION

Appearances:

> Ayanna Lewis-Gruss
> James E. Houpt
> ORRICK, HERRINGTON & SUTCLIFFE LLP
> *Attorneys for the Plaintiff*

> William J. Kelleher III
> Alexander D. Pencu
> ROBINSON & COLE LLP
> *Attorneys for Defendant Imaging Financial Services, Inc.*

> Harold A. Kurland
> Tony R. Sears
> WARD NORRIS HELLER & REIDY LLP
> Attorneys *for Defendant Eastman Kodak Company*

LEWIS A. KAPLAN, *District Judge*.

Plaintiff, an owner and operator of portrait studios, sought to convert its photograph

printing facilities from optical to digital technology.  It entered into agreements with defendants

Eastman Kodak Company ("Kodak"), from which it purchased photograph supplies, and Imaging Financial Services, Inc. ("Imaging"), an equipment leasing company, to finance its acquisition of digital printers.   The complaint alleges that plaintiff overpaid under the agreements and that defendants wrongfully refused to return its overpayments.

*Facts*

*Background*

The Picture People, Inc. ("TPP") is a privately owned company that owns and operates portrait studios in shopping malls.[1]  It long has had a business relationship with Kodak, from which it has purchased photographic printing supplies, known as "consumables," for use in its studios.[2]

In 2005, Plainfield Asset Management, a hedge fund, acquired TPP.[3]  It installed Charles Masson as TPP's chief executive officer to address the company's "operating problems" by closing its unprofitable locations and converting its photograph studios from optical to digital technology.[4] Later that year, Masson entered into negotiations with Kodak to purchase consumables and secure financing for TPP's "digital conversion."[5]  TPP wished to combine financing payments

---

[1]   Stip. Fact ¶ 1.

[2]   *Id.* ¶ 4.

[3]   *See, e.g.*, Shelp Decl. ¶ 3; Masson Dep. 10:19-11:5.

[4]   Masson Dep. 14:3-16:19.

[5]   *Id.* at 15:16-16:14.

for digital printers with payments for consumables that TPP regularly purchased from Kodak.[6] TPP, however, was struggling and considered itself "unfinanceable."[7]  It pressed Kodak to provide it "credit support"[8] and "guarantee [its] debt."[9]

*The Consumables Purchase Agreement*

        TPP and Kodak thereafter entered into a Consumables Purchase Agreement (the "CPA"), according to which TPP agreed to purchase ninety-nine percent of its consumables from Kodak.[10]  It agreed also to use "reasonable efforts" during 2006 and the first half of 2007 to enter into leases with Imaging for "equipment relevant to the optical-to-digital workflow conversion."[11] In return, Kodak agreed to provide consumables to TPP at a discount and to assist TPP in obtaining the desired financing from Imaging.[12]  The CPA provided also that Kodak would pay TPP's financing obligation if TPP entered into equipment leases with Imaging and that it would "fund such

---

[6]  Shelp Decl. ¶ 6; Sweany Decl. ¶¶ 9, 12.

[7]  *See, e.g.*, Masson Dep. 14:20-25, 50:16-23; DX N ("GE's asset-based lending group are a bunch of hard asses.  They'll take one look at our financials and vomit and that'll be the end of that.") (Masson email "RE: Kodak Financing"); DX Q.

[8]  Masson Dep. 50:2-51:7, 51:17-52:10; DX M; DX P.

[9]  DX P.

[10]  PX 1.

[11]  *Id.* at 1.  The CPA was effective as of January 1, 2006 even though it was not signed by TPP until July 2006 and by Kodak until September 2006.  *Id.* at 10; Kollar Decl. ¶ 5.

[12]  PX 1 at 4.

payments" by assessing a "surcharge,"to be set forth in an addendum, on the consumables TPP purchased from it.[13] The term of the agreement began on January 1, 2006 and runs until December 31, 2012.[14]

Masson believed that the CPA "was the best combination of interest rate and payment terms. The ability to make payments via a surcharge was also attractive to us."[15] He understood that "[t]he financing [from Imaging] is repaid via grossed up consumables prices, the advantage being we pay when we're making money and we don't when we aren't."[16]

*The "Partnering for Growth Program"*

Later in 2006, as TPP worked to obtain financing for digital printers, Kodak and TPP agreed that TPP would participate in Kodak's "Partnering for Growth Program" (the "Program").[17] The Program allowed a Kodak customer to obtain financing from Imaging and pay its financing fees through monthly surcharges on its purchases of Kodak consumables. Under the Program, Kodak billed its customer a single monthly invoice for its consumables purchases and assessed a surcharge, which was a stated percentage of the consumables' purchase price. Kodak remitted the monthly surcharge that it collected from the customer to Imaging for application against the customer's debt

---

[13]
  *Id.* at 4.

[14]
  *Id.* at 1.

[15]
  Masson Dep. 44:16-23.

[16]
  DX AA at 2.

[17]
  Shelp Decl. ¶ 7; Duguay Decl. ¶ 9.

service.[18]  Jer Kollar, TPP's chief financial officer, explained that:

> "TPP agreed to make its payments to [Imaging] through the surcharge because the
> surcharge reflected the seasonal nature of TPP's business. TPP earns higher revenues
> during the fourth quarter because customers tend to buy more portraits during the
> holiday season.  Thus, TPP tends to purchase more consumable products during the
> fourth quarter of the year.  The amount of money that was collected via the surcharge
> was expected to be greater during periods in which TPP purchased more goods."[19]

In September 2006, Kodak and Imaging entered into a recourse agreement pursuant

to which Kodak agreed to "indemnify and hold harmless [Imaging] from any and all risk of [l]oss

and out-of-pocket expenses" in connection with the proposed TPP financing.[20]

*The 2006 Note and the Note Addendum*

One month later, on October 25, 2006, TPP and Imaging entered into Promissory

Note and Security Agreement P4352071001 (the "2006 Note").[21]  Attached to and incorporated in

the 2006 Note was the Partnering for Growth Program Addendum (the "Note Addendum), which

the parties executed on the same day.  Pursuant to the 2006 Note, Imaging agreed to provide TPP

$3.6 million in financing for TPP's lease of seventy-two digital printers.  TPP agreed to repay the

$3.6 million to Imaging at 10.1 percent interest in twenty installments payable quarterly in arrears

---

[18]
    Shelp Decl. ¶¶ 8-11; Duguay Decl. ¶¶ 9, 11.

[19]
    Kollar Decl. ¶ 19.

[20]
    DX E.

[21]
    PX 3.  While the 2006 Note is dated November 22, 2006, the Note and Addendum to the
CPA were signed by Masson on October 25, 2006.  Kollar Decl. ¶ 6; PX 3; PX 4.

beginning on March 1, 2007.[22] The Note Addendum set forth the following framework for the

payment and application of monthly surcharges:

> "Debtor [TPP] desires to apply surcharges expected to be generated under the Consumable Agreement ("Surcharges") to reduce the amounts due under the Note and Security Agreement . . . .
>
> Debtor understands and agrees that Surcharges are generated by Debtor's purchase of certain products as described in the Consumable Agreement between Debtor and the Consumable Provider [Kodak]. Debtor further understands and agrees that product purchases and the processing of Surcharges are administered by the Consumable Provider or a dealer of the Consumable Provider from which Debtor purchases products."[23]

The total amount due to Imaging under the 2006 Note was $5.2 million. The Note Addendum

prohibited TPP's partial prepayment of the debt as follows:

> "*[TPP] may prepay in full, but not in part, its entire indebtedness hereunder* upon payment of an additional sum as a premium equal to the following percentages of the original principal balance: three percent (3%) prior to the first annual anniversary date of this Note and Security Agreement; two percent (2%) prior to the second annual anniversary date of this Note and Security Agreement; and zero percent (0%) thereafter, plus all other sums due hereunder."[24]

The Note Addendum likewise stated that "Debtor also understands that no partial or

other early prepayment of the amounts due under the Note and Security Agreement is anticipated or

permitted by Payee . . . ."[25] It provided also that "Debtor desires to apply surcharges expected to be

---

[22]
       PX 3. The initial payment of $0 was due on March 1, 2007. Quarterly installments of $246,690 were payable beginning on June 1, 2007.

[23]
       PX 4.

[24]
       PX 3 at 2 (emphasis added).

[25]
       PX 4. The Note further provides that "DEBTOR'S OBLIGATIONS TO REMIT PAYMENTS TO [IMAGING] HEREUNDER SHALL BE ABSOLUTE, UNCONDITIONAL AND NON-CANCELLABLE . . . AND SHALL NOT BE SUBJECT TO ANY SET-OFFS, CLAIMS OR DEFENSES OF ANY FAILURE WHATSOEVER."

generated under the Consumable Agreement . . . to reduce amounts due under the Note and Security Agreement."[26]  Thus, TPP could not use its monthly surcharge payments to Kodak to reduce the principal amount it owes Imaging.  Masson understood that "[t]here is nothing in the note that lets us off the hook to make payments on the surcharges."[27]

*The CPA Addendum*

On the same day that TPP and Imaging entered into the 2006 Note, TPP and Kodak entered into an Addendum to the CPA (the "CPA Addendum"), which was the addendum contemplated by the CPA.[28]  It required that TPP repay its obligation on the Note through monthly surcharge payments to Kodak.  It stated that:

> "Customer [TPP] wishes to have the added convenience of making its lease payments for the Equipment to [Imaging] at the same that it pays for its consumable purchases under the [CPA].  Kodak is willing to collect these lease payments at the same time it collects the sums owed under the [CPA] for consumables purchases. . . .
>
> 1.  *In addition to all payments and charges set forth and owing under the [CPA], [TPP] also agrees to pay Kodak on a monthly basis a surcharge equal to 32.57 percent of the selling price of all consumables sold to Customer by Kodak under the [CPA].*  This surcharge amount will be added to each invoice issued by Kodak under the Agreement until Customer has paid a cumulative total amount of surcharges of $5,213,600.00 plus applicable tax, the total of all lease payments and related charges due to [Imaging] under the lease for the Equipment . . . .
>
> 2.  Kodak agrees to pay the collected surcharge to [Imaging] once each month for application against Customer's lease payment for the Equipment. . . .

---

[26]    *Id.*

[27]    Masson Dep. 96:13-97:3.

[28]    PX 2.

8

> 4. . . . *[N]othing set forth in this Addendum diminishes in any fashion Customer's obligation to pay [Imaging] all lease payments when due*, the rights of [Imaging] under the lease to collect any amounts owed from Customer or the defenses which [Imaging] may have, if any . . . ."[29]

The 32.57 percent surcharge was Kodak's "estimate of the percentage of the price of consumables TPP would purchase over the five-year term of the Note[] that would amount to the roughly $5.2 million owed to [Imaging] under the Note."[30] The Addendum, however, required that the surcharge rate be adjusted if the surcharges that TPP paid exceeded its obligations to Imaging. It provided in relevant part:

> "Kodak will send Customer an annual reconciliation statement within sixty days of the close of each calendar year. This reconciliation statement will list all payments for consumables under the Agreement, all surcharges paid by Customer, and all lease payments made on Customer's behalf. *In the event that the total surcharges paid exceeds the total payments owed [by] Customer under the [Imaging] lease, the remaining surcharges will be adjusted accordingly.* In the event that the amount of the surcharges paid by Customer is less than the Customer's cumulative lease payments for the Equipment, [Imaging] will invoice Customer for the difference. Kodak may, at its option, increase the surcharge percentage for the remaining term of the Agreement to the extent that the increase is necessary to pay the shortfall."[31]

The CPA Addendum, however, is silent on how surcharge adjustments were to be determined.

At TPP's request, the Addendum was modified to require that Kodak pay any late fees assessed by Imaging for any failure of Kodak to submit timely payments.[32] TPP did not request any other modification of the CPA Addendum.[33]

---

[29] PX 2 at 1-2 (emphasis added).

[30] Shelp Decl. ¶¶ 18-20; Sweany Decl. ¶ 23.

[31] PX 2 ¶ 3 (emphasis added).

[32] PX 2; Stip. Fact ¶ 7.

[33] Stip. Fact ¶ 7.

*TPP Raises Concerns Regarding the Payment Structure*

By February 3, 2007, TPP had paid Kodak $1,047,874.30 in surcharge payments that it had incurred in connection with its consumables purchases during the 2006 holiday season.  Its first installment under the 2006 Note of $246,960, however, was not due until June 1, 2007.[34]

On February 13, 2007, Kollar explained to Kodak that TPP had "paid approx $1 mm to Kodak and which if we keep up that pace will have paid off the printers in about a year.  I do not want to nor should have to pay [Imaging] a prepayment penalty because we have given an accelerated credit schedule.  My recollection was that the surcharge can adjust annually."[35]  Kodak responded that it had "requested an accounting" and would "get back to [TPP]."[36] One month later, Kollar again expressed his concern that "if we continue at the initial surcharge, [Imaging] will be paid off this year – not the spirit nor intent of the agreement."[37]   That fear, however, was not realized. In the following months, TPP closed 145 of its 319 studios due to poor performance[38] and advised Kodak that its consumables purchases in 2007 would be approximately fifty percent less than in 2006.[39]

---

[34]   Kollar Decl. ¶ 21.

[35]   DX Y.

[36]   *Id.*

[37]   PX 21.

[38]   Shelp Decl. ¶¶ 34-35; Mason Dep. 11:24-13:12, 57:7-57:20.

[39]   Shelp Decl. ¶¶ 34-35; Sweany Decl. ¶ 46.

At TPP's request, Kodak provided a reconciliation statement on May 3, 2007, more than nine months before it was due under the CPA Addendum.[40]  It advised Kollar that the surcharge rate had reflected TPP's projected purchases over a five-year period and that a rate reduction was not warranted in view of TPP's "reduced volume forecasts."[41]  Kollar replied that he didn't "mind being a little ahead" but did not want to incur a prepayment fee under the Notes.[42]  In any event, Imaging never assessed any such prepayment penalty against TPP.[43]

In mid-May 2007, L. Thomas Jewell replaced Kollar as TPP's chief financial officer. In the meantime, TPP continued to pay its monthly surcharges to Kodak without objection.[44]  In fact, later that month, Masson explained to Duff & Phelps Securities LLC, which TPP had retained in connection with its studio closings, that:

> "Considering that we were (and still) are unfinanceable, the deal seemed a decent one to us. . . . [T]here's a complicated arrangement whereby our payments [to Imaging] are made a function of our consumables purchases.  The idea behind this is that we pay more on the loan when we ought to have more cash (high consumables ought to translate into higher sales and vice versa).  This has worked reasonably well in practice though I see that we recently have wound up paying ahead of what we normally would have.  Oh well."[45]

---

[40]  PX 7.  The CPA Addendum provides that "Kodak will send [TPP] an annual reconciliation statement within sixty days of the close of each calendar year."  PX 9.

[41]  DX K.

[42]  *Id.*

[43]  Duguay Decl. ¶ 32.

[44]  *See, e.g.,* DX V.

[45]  DX Q; *see also* Kollar Supp. Decl. ¶ 3 ("I understood that due to the seasonal nature of TPP's business, the surcharge could result in TPP being slightly 'paid ahead' on a quarterly basis.").

*The 2007 Note*

Notwithstanding Kollar's concerns regarding the surcharge payment structure, TPP and Imaging in August 2007 entered into Promissory Note and Security Agreement P44860803001 (the "2007 Note"), a second promissory note for $385,000 of additional financing in connection with TPP's lease of a second set of digital printers.[46]  TPP agreed to repay the $385,000 at 10.75 percent interest in twenty installments payable quarterly in arrears beginning on September 15, 2007.[47]  The 2007 Note attached the Note Addendum and contained the same financing and surcharge payment structure as the 2006 Note.[48]

*TPP Requests that Surcharge Payments Be Returned*

As of January 26, 2008, TPP had made twelve surcharge payments to Kodak totaling $2,158,545.96.[49]  The quarterly lease payments that had come due under the 2006 and 2007 Notes, however, totaled only $767,722.20.  On that day, Jewell requested that Kodak forecast TPP's surcharge payments and "pull together a summary of [Kodak]'s records on" the Notes.[50]  Five days later, Kodak provided a second reconciliation statement and offered to reduce TPP's surcharge rate

---

[46]  PX 5; Stip. Fact ¶ 6.

[47]  PX 5.

[48]  *Id.*

[49]  Jewell Decl. ¶ 16; PX 7.

[50]  DX I.

from 32.57 percent to 27.5 percent.[51]

TPP was not satisfied and rejected the proposal.  Jewell explained to Kodak that he preferred that Imaging return the "overpayment" rather than reduce the surcharge rate.[52]  In the following months, TPP attempted unsuccessfully to recover its surcharge payments from Imaging and to renegotiate the CPA with Kodak.  On April 1, 2008, Kodak advised TPP that renegotiation of the CPA was a "closed issue."[53]  Later that month, Jewell demanded by letter that Imaging return $1,390,823.96 of "accumulated overpayment."[54]  Imaging refused.  This action ensued in June 2008.

*This Action*

TPP asserts claims against Imaging for unjust enrichment, conversion, and breach of the 2006 and 2007 Notes on the theory that Imaging "improperly refused to return to TPP amounts paid by TPP in excess of its current financing obligation."[55]  The complaint alleges that TPP's overpayment under the Notes exceeds $1.4 million.  TPP asserts also claims against Kodak for tortious interference, aiding and abetting conversion, and *prima facie* tort on the ground that Kodak

---

[51]

    *Id.*

[52]

    Jewell Decl. ¶¶ 9-10.

[53]

    Masson Decl. ¶ 18; PX 47.

[54]

    PX 50.

[55]

    Joint Pretrial Order 1.

"refus[ed] to allow [Imaging] to return TPP's overpayments."[56]

The parties have consented to try the case to the Court on stipulated record.[57] This contains the Court's findings of fact and conclusions of law.

## *Discussion*

### I.   *The Unjust Enrichment Claim*

TPP asserts that Imaging "has been unjustly enriched by its continued possession of the payments it has received in excess of TPP's current obligations under the Notes."[58] It maintains that Imaging improperly has retained its "excess payments" under the CPA and the Notes without applying them to reduce the Notes' principal.[59]

"The theory of unjust enrichment lies as a quasi-contract claim.  It is an obligation the law creates *in the absence of any agreement*."[60] As the New York Court of Appeals has stated, "[t]he existence of a valid and enforceable written contract governing a particular subject matter

---

[56]

Pl. Mem. 21.

[57]

*See* Apr. 8, 2009 Stipulation [DI 24].

[58]

Pl. Mem. 17.

[59]

*Id.* at 18.

[60]

*Beth Israel Med. Ctr. v. Horizontal Blue Cross Blue Shield of N.J., Inc.*, 448 F.3d 573, 586-87 (2d Cir. 2005) (quoting *Goldman v. Metro. Life Ins. Co.*, 5 N.Y.3d 561, 572 (2005)) (emphasis in original).

ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."[61]

An unjust enrichment claim therefore does not lie where a valid contract covers the subject matter

that gives rise to the alleged enrichment.  Here, the CPA and the Notes govern TPP's obligations and

Imaging's receipt and retention of the surcharge payments.   The claim for unjust enrichment

therefore is dismissed.


II.     *The Conversion Claim*

TPP asserts a claim for conversion against Imaging on the theory that Imaging

"unlawfully converted TPP's funds by refusing to return the surcharges that TPP paid to [Imaging]

in excess of TPP's then current obligations."[62]   An action for conversion, however, cannot be

predicated on a breach of contract.[63] TPP has brought claims for both conversion and breach of

contract on the ground that Imaging "overpaid" its obligations under the Notes and that Imaging has

not returned the payments.[64]  The claims thus rest on the same factual assertions.  In consequence,

---

[61]

   *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653
   (1987) ("A 'quasi contract' only applies in the absence of an express agreement, and is not
   really a contract at all, but rather a legal obligation imposed in order to prevent a party's
   unjust enrichment.").

[62]

   Pl. Mem. 19.

[63]

   *Corporacion Fruticola De Chincha v. Watermelon Depot, Inc.*, No. 05 Civ. 6293 (KNF),
   2008 WL 2986276, *4 (S.D.N.Y. July 31, 2008). (citing *Fesseha v. TD Waterhouse Inv.
   Servs.*, 305 A.D.2d 268, 269, 761 N.Y.S.2d 22, 24 (1st Dep't 2003)).

[64]

   Am. Cpt. ¶¶ 26-30; joint pretrial order ¶¶ 36-39.

the conversion claim is dismissed.[65]


III.    *The Contract Claims*

TPP argues that Imaging breached the "unambiguous terms" of the 2006 and 2007 Notes "by refusing to return TPP's overpayments, and to apply the amount as a partial prepayment in breach of explicit and repeated provisions that the notes do not permit partial prepayments."[66]

As an initial matter, as TPP executives conceded in depositions,[67] nothing in either the Notes or the CPA required Imaging to return any part of TPP's surcharge payments. TPP therefore has not identified any provision of the Notes that Imaging allegedly has breached.[68]

TPP rejoins that the monthly surcharge payments that it knowingly and voluntarily made pursuant to the CPA and the Notes were improper and should have been applied to reduce the Notes' principal. It asserts that Imaging's "refusal to return the overpayments to PP violates the provision banning partial prepayments."[69] Its claim, however, is contrary to the plain terms of the Notes. The Notes expressly provide that TPP repays its obligation to Imaging through a monthly surcharge on the consumables that TPP purchases from Kodak. They provide also that "[TPP] may

---

[65]

Thus, TPP's claim against Kodak for aiding and abetting conversion also fails.

[66]

Pl. Mem. 20.

[67]

*See* Kollar Dep. 48:20-49:11; Masson Dep. 56:7-15, 96:13-97:3; Jewell Dep. 23:2-24:25.

[68]

*See, e.g., Sud v. Sud,* 211 A.D.2d 423, 424, 621 N.Y.S.2d 37, 38 (1st Dep't 1995) (dismissing breach of contract claim where plaintiff failed to identify "specific provisions of the contract upon which liability is predicated") (citation omitted).

[69]

Pl. Mem. 21.

prepay in full, *but not in part*, its entire indebtedness hereunder."[70]  Thus, TPP's partial prepayment

of its obligation under the Notes is expressly precluded and subject to penalty regardless of TPP's

surcharge payments under the CPA.  Imaging nevertheless has not assessed any such penalty against

TPP for prepayment of the Notes.[71]  In any event, the prohibition on partial prepayment is for the sole

benefit of Imaging, not TPP.  Imaging therefore was entitled to waive it.[72]

There is nothing unjust about this conclusion.  The monthly surcharge structure was

implemented for TPP's "added convenience" to allow it to adjust its payments according to the

seasonal fluctuations of its business.[73]  The payments that Imaging receives from TPP under the

Notes are determined entirely on the basis of TPP's consumables purchases from Kodak.  Masson

understood that TPP would be "paid ahead" and that "we pay more on the loan when we ought to

have more cash."[74]  At TPP's request, Kodak offered to adjust the consumables surcharge it assessed

from 32.57 percent to 27.5 percent under the CPA Addendum, an offer that TPP rejected.[75]  In any

---

[70]

      PX 3 at 2 (emphasis added).

[71]

      Duguay Decl. ¶ 32; Richardson Decl. ¶ 26.

[72]

      *See Citadel Equity Fund Ltd. v. Aquila, Inc.*, No. 05-3151-CV, 168 Fed. Appx. 474, 476 (2d Cir. Feb. 22, 2006) ("Under New York law, a party may unilaterally waive a contract provision inserted solely for its benefit.").

[73]

      PX 2 at 1.

[74]

      DX Q; *see* Masson Dep. 73:8-24.

[75]

      Ex. I.

event, TPP has yet to satisfy its $5.2 million obligation to Imaging under the Notes.[76]

In any event, TPP has not shown that Imaging breached the Notes.[77]  Its contract claims are dismissed.[78]

IV.     The Prima Facie *Tort Claim*

TPP asserts a claim against Kodak for *prima facie* tort on the theory that "Kodak intentionally inflicted economic harm on TPP by refusing to allow [Imaging] to refund TPP's overpaid moneys."[79]  The elements of a claim for *prima facie* tort are (1) intentional infliction of harm (2) causing special damages (3) without excuse or justification (4) by an act or acts that otherwise would be lawful.[80]  In order to satisfy the third element, the plaintiff must allege and prove that the conduct complained of was "done with the sole intent to harm."[81]  "Motives such as profit,

---

[76]

Shelp Decl. ¶ 46 ("Kodak has not yet invoiced TPP for a cumulative total of surcharges totaling $5,202,241.80–the total of TPP's obligations to [Imaging] under the Notes.").

[77]

TPP's contract claims fail also under the voluntary prepayment doctrine, which bars recovery of payments made by a plaintiff "with full knowledge of the facts." *See, e.g., Dillon v. U-A Columbia Cablevision of Westchester, Inc.,* 292 A.D.2d 25, 27, 740 N.Y.S.2d 396, 398 (2d Dep't 2002).

[78]

Thus, TPP's claim against Kodak for tortious interference also fails. *See, e.g., Akcess Pac. Group L.L.C. v. Winstar Commc'ns Inc.,* 67 F. Supp. 2d 394, 398 (S.D.N.Y. 1999) ("[I]f there is no breach of contract, no one can be liable for inducing breach.").

[79]

Pl. Mem. 24.

[80]

*Rozhetskin v. Reiman,* No. 06 Civ. 7119 (LAK), 2007 WL 3254911, at *2 (S.D.N.Y. Oct. 31, 2007) (citing *Sigmon v. Parker Chapin Flattau & Klimpl,* 901 F. Supp. 667, 680 (S.D.N.Y. 1995)).

[81]

*Id.*

18

self-interest, or business advantage will defeat a *prima facie* tort claim."[82]

There is no evidence whatsoever that Kodak acted with "the sole intent to harm" TPP. As an initial matter, TPP has no right to a refund of its surcharge payments under either the CPA or the Notes. In any event, Kodak fully guaranteed TPP's performance under the Notes. As TPP has yet to satisfy its $5.2 million obligation to Imaging, any refund of surcharge payments would expose Kodak to financial risk. In view of Kodak's economic interest in TPP's satisfaction of its Note obligations, any allegation that Kodak acted solely with intent to harm TPP is unfounded. TPP's *prima facie* tort claim fails.

### Conclusion

For the foregoing reasons, the action is dismissed. The Clerk shall close the case.

SO ORDERED.

Dated:        August 11, 2010

_____
Lewis A. Kaplan
United States District Judge

---

[82]  *Id.*; *see also Marcella v. ARP Films, Inc.*, 778 F.2d 112, 119 (2d Cir. 1985).